THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EMERIT D. LINDBECK, Defendant-Appellant.

Third District   Nos. 3—89—0740 through 3—89—0742 cons.

Opinion filed September 14, 1990.

Hamm & Hanna, Ltd., of Peoria (Ronald L. Hamm, of counsel), for appellant.

Larry VanDerSnick, State's Attorney, of Cambridge (Rita Kennedy Mertel, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

Defendant Emerit D. Lindbeck was charged with four counts of forgery (Ill. Rev. Stat. 1987, ch. 38, par. 17—3), four counts of mutilation of election materials (Ill. Rev. Stat. 1987, ch. 46, par. 29—6) and one count of perjury (Ill. Rev. Stat. 1987, ch. 38, par. 32—2). The forgery and mutilation of election materials charges against the defendant stem from an April 7, 1987, election in which the defendant was the successful candidate for mayor of the City of Kewanee. The perjury charge arose from the defendant's testimony in the subsequent grand jury investigation into the election. The charges were consolidated for trial. The defendant was tried before a jury and convicted on all counts. He was sentenced to concurrent 30-month terms of probation. He appeals his convictions. We affirm.

THE FORGERY AND MUTILATION OF ELECTION MATERIALS CONVICTIONS.

At the defendant's trial, the State called Carol Peterson, the chief deputy clerk in charge of voter registration in Henry County. Peterson testified that about one month after the election she was advised by Reesa Van Raemdonk, an election judge, that the two absentee ballots belonging to Adrian and Betty Ball had been voted by person(s) other than the Balls. While investigating this allegation, Peterson also found two absentee ballots that had been improperly processed. These ballots, belonging to Patrick and Christopher Williams, had been voted since they were no longer in the envelopes, but had not been processed correctly. Peterson identified the Balls' and the Williamses'

applications for absentee ballots, ballot envelopes and return envelopes.

Peterson further testified that the posting list, a record made when absentee ballots are sent out and returned, is a public document and that the defendant had examined the list once. She also testified that it is not necessary to return an absentee ballot if you decide that you do not want to use it. On cross-examination, Peterson testified that it is proper to assist someone in filling out the top of a ballot envelope.

Adrian and Betty Ball testified that in early 1987 they went to Florida and arranged with the mail carrier to leave their mail with Adrian's mother. While the Balls were on vacation, Don Francis, a retired firefighter and a volunteer in the defendant's campaign, sent them applications for absentee ballots which they filled out and returned around February 25, 1987. The Balls testified that People's exhibits Numbers 1 and 4 were not the absentee applications that they had returned. On March 29, 1987, when they called Adrian's mother, she told them that their ballots were at her house. Adrian told her to tear them up because there was insufficient time to use the ballots. The Balls testified that People's exhibits Numbers 2 and 5, ballot envelopes and certifications for absentee ballots in their names, were not in their own handwriting and contained the wrong birthdates. The Balls did not give anyone permission to use their ballots.

Reesa Van Raemdonk testified that while serving as an election judge, she saw the Balls' absentee ballots counted. Since Adrian's mother had previously told Van Raemdonk that she had the Balls' ballots and was unable to reach them, Van Raemdonk contacted Adrian's mother to let her know that the ballots had been voted.

Van Raemdonk further testified that Adrian Ball asked her about the ballots a few days later. After her conversation with Adrian Ball, Van Raemdonk talked to Donald Francis. After this conversation, Van Raemdonk went to the defendant's office. The defendant asked Bonnie Tomlinson to leave the office and told Van Raemdonk that he had the Balls' ballots. The defendant indicated to Van Raemdonk that he had put them on the desk in his campaign office and did not know what had happened to them.

Don Francis testified that he obtained applications for absentee ballots for his son and the Balls from Leonard Holton, a candidate for the city council. The defendant was present when Francis received the applications. Francis filled out the writing on the applications for Adrian and Betty Ball and signed the Balls' names. Francis indicated that the writing on People's exhibit Number 4 does not look like his

writing. On the Saturday prior to the election, Francis went to campaign headquarters. The defendant was the only person there and Francis told the defendant that Adrian Ball's mother had called to advise that she had Adrian and Betty Balls' ballots and there would be insufficient time to vote. The defendant instructed Francis to obtain the ballots from Adrian's mother and the defendant would take care of turning them in. Later that morning, Francis obtained the ballots and brought them to the defendant.

Francis further testified that after the election Van Raemdonk called and indicated that the Balls' ballots had been voted. Francis called the defendant with this information. The defendant told Francis that nothing like that had happened and someone was trying to cause trouble. Finally, Francis testified that his testimony before the grand jury had been untruthful and that he was testifying pursuant to a plea bargain arrangement arising from his involvement in the incident.

The evidence deposition of Reva Ball, Adrian's mother, was admitted into evidence. The deposition indicated that before noon on the Saturday before the election, she gave Francis the sealed, absentee ballots of Adrian and Betty Ball.

Patrick and Christopher Williams testified. They testified that they signed applications for absentee ballots in 1987 but never received the ballots. They also testified that the dates of birth and signatures on the ballot envelopes and certifications were not their dates of birth and not their signatures.

Dale Williams, the father of Patrick and Christopher, testified that he worked as a campaign volunteer for the defendant in 1987. He testified that he had a small pad of absentee ballot applications and observed his sons sign applications. He turned the applications in to the defendant and Holton. When he received the sealed, absentee ballot envelopes for his sons, he put them in his briefcase and took them to campaign headquarters. The defendant was there. He threw the ballots on a table and told the defendant that at least they had two votes. The defendant picked up the ballots, put them in a desk drawer and said that he would take care of them. Dale Williams testified that he never saw the ballots again. Dale Williams also testified that his testimony before the grand jury had been untruthful and that his testimony in the instant case was part of a plea bargain arrangement stemming from charges filed against him in regard to this incident.

Dale Williams further testified that after he was indicted for his illegal activities, he discussed it with the defendant. He told the defendant that he would like to know who had signed his sons' ballots

and used incorrect birthdates. The defendant then asked him if he knew what he had done with the ballots and when he indicated that he did not, the defendant indicated that he had given them to the defendant.

Sergeant Steve Sottos of the Illinois State Police identified the defendant's handwriting samples and the defendant's "normal course of business writing" samples. Sottos further testified that on January 12, 1988, he interviewed the defendant and the defendant indicated that he received the Balls' ballots from Francis. The defendant further indicated that he had helped 10 to 15 people fill out ballot envelopes but did not mention the Balls.

A post office supervisor testified that the Balls' and Patrick Williams' and Christopher Williams' ballot envelopes were postmarked and cancelled in Galesburg. He also testified that the Balls' ballot envelopes were mailed after 5 p.m. on Saturday, April 4, 1987, and before 5 p.m. on Monday, April 6, 1987.

Charles Perrotta, a qualified document examiner, testified for the State. Perrotta compared the defendant's handwriting exemplars and "normal course of business writing" documents to the ballot envelope and certifications of the Balls and Williamses. Perrotta testified that the defendant wrote "Kewanee" on Patrick Williams', Christopher Williams' and Adrian Ball's ballot envelopes. Perrotta also testified that the defendant probably prepared all the hand printing on those exhibits. Perrotta could not positively determine who prepared the signature on the ballot envelope of Christopher Williams because the signature was very badly distorted. The writing was not indicative of normal handwriting ability. However, based on the similarities between the defendant's known handwriting and the signatures on the ballot envelope, the defendant could not be eliminated as a possible writer of Christopher Williams' signature.

Perrotta further testified that the defendant's initial known writing sample was of very poor quality. The writing in the sample appeared to be distorted. Perrotta was only able to make comparisons when he received the defendant's "normal course of business writing" samples, which were not distorted.

In relation to these charges, the defendant testified that during the election he shared a campaign office with four other people running for city council positions. Everyone shared the desks at the headquarters, and there were 8 to 10 keys to the office in circulation. The candidates kept a stack of absentee ballot applications at the office.

The defendant further testified that Dale Williams came to the headquarters in March and stated "at least we got two votes if we

don't get any more." The defendant testified that he did not look at the ballots but took them and put them on a desk. A few days later, the defendant filled out the top of the ballots so that he would know who the ballots belonged to and the boys (Christopher and Patrick) could sign them when they came home. The defendant further testified that he had not seen the boys' original ballot envelopes in their present condition. He denied signing Patrick's and Christopher's names to the ballots, ballot envelopes or voting either of their ballots.

The defendant also testified that on the Saturday prior to the election, Francis came in with the Balls' sealed absentee ballots. The defendant testified that although he did not presently recall writing on the Balls' envelopes and ballots, he admitted that the writing on those items was his. The defendant denied signing the Balls' names to the ballots, ballot envelopes or voting either of their ballots.

THE PERJURY CONVICTION

The State called Greg Johnson, who testified that he was the grand jury foreman in July 1988, when a vote fraud investigation began. Johnson administered an oath to testify truthfully to the defendant. Johnson further testified that the defendant was handed a number of ballot envelopes and also transparencies of a number of documents during his testimony before the grand jury. Johnson could not specifically recall which ballot envelopes were handed to the defendant.

The People and defendant stipulated that People's exhibit 18 is a true and accurate transcript of the defendant's testimony before the grand jury. During his testimony before the grand jury, the defendant related that he knew Don Francis and Adrian Ball. The defendant denied assisting the Balls in filling out their applications for absentee ballots.

Additionally, the defendant testified that when Francis returned the Balls' ballot to him they were sealed. The defendant denied telling Francis that the ballots had to be turned in if they were not voted. The defendant further testified that when the ballots were missing from his desk on Monday he presumed that someone had taken them. The defendant was then shown a number of exhibits. He claimed that he had not seen the exhibits and was not familiar with the writing on the exhibits.

The People and defendant also stipulated as to the identity of the grand jury exhibits. The prosecutor then testified regarding the identity of some of the grand jury exhibits outside of the presence of the jury.

In response to the evidence presented by the State in relation to the perjury charge, the defendant testified that he was not advised as to the specifics of the grand jury investigation. He understood the investigation to be in regard to "irregularities of some kind" as to some absentee ballots voted in the election. During cross-examination, when confronted with the fact that he now recognized exhibits partially prepared by him when at the grand jury he denied recognizing those same documents, the defendant maintained that at the grand jury he was only looking at the hand*writing* on the exhibits rather than the hand*printing*. Additionally, the defendant alluded that the use of transparencies, rather than original documents, caused confusion as to what he did and did not recognize.

At the close of the State's case in chief, the defendant moved for a directed verdict on all charges. The defendant's motion for directed verdicts as to the forgery and mutilation of election materials charges was immediately denied. As to the perjury charge, the defendant argued that the questions asked of him at the grand jury were defective; claiming them to be ambiguous and confusing. The trial judge took that motion under advisement. Although the court eventually denied the motion, the defendant elected to begin presenting his defense prior to the pronouncement from the bench.

The defendant's appeal raises three issues. Initially the defendant contends that the trial court erred in refusing to grant the defendant's motion for a directed verdict on the perjury count. The defendant contends that the questions asked of him at the grand jury were fundamentally defective, that there wasn't any proof that at the time the defendant made the statements he did not believe them to be true and that the questions were not material. Accordingly, the defendant argues that his motion for a directed verdict should have been granted. The defendant further contends that the denial of his motion for a directed verdict prejudiced him such that he should be granted a new trial on the counts of forgery and mutilation of election materials.

The State's initial response is that the defendant waived any right to raise this claim on appeal. The State contends that because the defendant introduced evidence after the trial court took the defendant's motion for a directed verdict under advisement, the defendant waived his right to a directed verdict. The State doesn't cite any authority directly on point, but rather advances two cases in support of its position. See *People v. Gokey* (1974), 57 Ill. 2d 433, 312 N.E.2d 637 (a defendant waives any right to a directed verdict when he introduces evidence after the denial of his motion); *People v. Clankie*

(1989), 180 Ill. App. 3d 726, 536 N.E.2d 176 (a defendant has the responsibility for obtaining rulings on his motions and his failure to do so constitutes a waiver of those issues on review).

■■ We agree with the State that the defendant has waived this issue. When the defendant made his motion for a directed verdict as to the perjury charge and was advised by the trial court that it would take the motion under advisement, the defendant should have requested a recess to allow the trial court time to make a ruling. The effect of defendant's failure to request a recess and continue with his defense was to afford him the opportunity to present his side of the story and obtain an acquittal on all charges. The defendant cannot now request this court to review the trial court's decision regarding the motion for a directed verdict.

Moreover, we note that the defendant never moved to sever his perjury charge from the forgery and mutilation of election charges pursuant to section 114—8 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 114—8). Accordingly, even if the trial court had erred in denying the defendant's motion for a directed verdict, this fact would preclude the defendant from contending that he was prejudiced by having all the charges tried in one trial.

The defendant next contends that the State failed to establish his guilt of perjury, forgery and mutilation of election materials beyond a reasonable doubt. We disagree.

■■ When presented with a challenge to the sufficiency of the evidence, it is not this court's function to retry the defendant. The inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Once the defendant has been found guilty of the crime charged, the factfinder's role, as weigher of the evidence, is preserved. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

■■ We have reviewed the record and the arguments propounded by the defendant. We initially note that we find no merit to the defendant's contention that the questions asked of him at the grand jury were fundamentally defective and that the jury went against the manifest weight of the evidence in finding him guilty of perjury. We strongly reject the defendant's suggested distinction between handwriting and handprinting. The questions asked of the defendant were simple, straightforward questions requiring a simple answer. Our review of these questions, the transcript of the grand jury proceedings and the defendant's testimony at trial leads us to the inescapable conclusion that the jury could conclude that the defendant deliberately

lied when he indicated that he did not recognize certain documents that he himself had partially prepared. Accordingly, we find that ample evidence exists to support the jury's finding of guilt as to the perjury charge.

As to the defendant's other arguments, they focus on factual questions decided upon by the jury. A jury is not required to believe a defendant's explanation for his conduct. (*People v. Wiley* (1988), 174 Ill. App. 3d 444, 528 N.E.2d 26.) We are of the opinion that there exists ample evidence to support defendant's conviction as to the forgery and mutilation of election materials counts.

Lastly, the defendant argues that the trial court erred with respect to two evidentiary rulings. We find this issue to be without merit, and we decline to address it.

Accordingly, the decision of the circuit court of Henry County is affirmed.

Affirmed.

STOUDER and SCOTT, JJ., concur.